THE CITY OF DES MOINES, Appellant, v. THE DES
    MOINES WATERWORKS COMPANY, and DES MOINES
    WATERWORKS CO. v. THE CITY OF DES MOINES,
    Appellant.

**Arbitration: ORDINANCE.** An ordinance stipulating that water shall be furnished at the average rate paid in other cities of the Union having efficient waterworks operated by private corporations, and providing for arbitrations of such rates if they cannot be fixed by agreement, is void for indefiniteness, and in a suit for water furnished, the rate should be fixed by judicial inquiry upon the basis of reasonable compensation uncontrolled by the statute which limits a water tax to a five mill levy.

**Schedule of Water Rates: REASONABLENESS.** The city cannot establish a rate at which water shall be furnished, which is unreasonable. Articles 8 and 12, Constitution of Iowa, and chapter 16 of Acts of 1888, construed.

**SAME.** But an ordinance fixing water rates is *prima facie* a reasonable schedule; and where in a suit to recover for water furnished a city, it appears by such presumption or by stipulation that reasonable rates have been fixed by ordinance, a temporary injunction should be granted, pending suit, compelling the waterworks company to furnish the water at the rate so fixed.

**SAME: ANNEXATION.** Rates so fixed apply to the city as extended by annexation, though a different water rate has been fixed in the territory annexed.

**Practice on Appeal: ABATEMENT.** The payment of an amount due at all events will not warrant the dismissal of an appeal.

*Appeal from Polk District Court.*—HON. S. F. BALLIET
            and HON. C. P. HOLMES, Judges.

TUESDAY, OCTOBER 1, 1895.

The first of the above-entitled causes is a suit in equity, by which the plaintiff city seeks to enjoin the defendant water company from demanding or receiving from the city a greater sum for furnishing water to the city and its inhabitants than the rate established by a certain ordinance passed by the city council on the

twenty-third day of January, 1893, and to enjoin the
said company from ceasing to supply water to the city.
The last two of the above-named suits are actions at
law to recover of the city for water furnished under an
adjustment of water rates made by the city and the
water company in the year 1883. All of the actions,
when considered together, involve substantially the
same questions. The contention of the water company
is that, under the ordinances and resolutions of the city,
the city council has no power to prescribe by ordinance
the rates to be paid for water furnished by the water
company. The city maintains that it has such author-
ity, and that the ordinance passed in the month of Jan-
uary, 1893, is a valid exercise of that power. The court,
upon a hearing for a temporary injunction in the equity
cause, refused to grant the same. A jury was waived
in the law actions, and upon a trial to the court, judg-
ments were rendered for the water company for such
sums as would have been due if the controverted ordi-
nance had not been passed. The city appeals in all the
cases.—*Reversed.*

*Hugh Brennan, J. E. Mershon, I. M. Earle, J. K.
Macomber,* and *Wm. H. Baily* for appellant.

*Cummins & Wright* for appellee.

Rothrock, J.—I.   We think it proper to determine
the several cases in one opinion. It appears to us that
such a consideration of the questions will enable us to
give a clearer and more satisfactory understanding of
the questions decided than we could attain by a sepa-
rate consideration of each case. The validity of
the ordinance of 1893 is the ultimate question
in all the cases. Back of that, all of the powers
of cities and towns pertaining to the establishment and
maintenance of waterworks have been elaborately dis-
cussed, from a statutory and constitutional standpoint,

and hundreds of authorities have been cited in hundreds of pages of printed arguments. In addition to these arguments, the causes were ably and elaborately presented orally, so that it will be no fault of counsel if this court should reach a wrong conclusion as to the rights of the parties. It is proper to say at the outset that there are really no controverted facts, in any of the cases, which we think are at all material. It is true, some oral evidence was introduced, but nothing which raises any conflict upon any question of fact. There were certain rulings on demurrers in the law actions which will receive no separate consideration. In all such controversies as this, a plain statement of the material and conceded facts is necessary to an intelligent solution of the questions of law required to be determined.

II. In the year 1871 a corporation known as the Des Moines Water Company was organized for the purpose of building and operating waterworks in the city of Des Moines. On the first day of May of that year, the city council passed an ordinance by which the said company was authorized to build, maintain, and operate waterworks in the city, to supply the said city and its inhabitants with pure and wholesome filtered water, and to use the streets, alleys, and avenues of the city for the purpose of laying the water pipes neces sary to convey the water throughout the city. This ordinance provided that said water company should have the exclusive right to construct and operate their works for the term of forty years. It is not necessary to set out the ordinance at length in this opinion. It is sufficient to say that, in its general provisions, it is similar to ordinances usually adopted in such cases, where an exclusive right has been granted, such as authority to use the streets, alleys, and avenues for proper purposes, and there is the usual provision for the purchase of the waterworks by the city, at its

option.    Sections 6 and 7 of said ordinance are as
follows:

"Sec. 6.    The company shall furnish to the city
authorities and to the citizens upon the several streets,
avenues and public grounds along which the pipes and
water courses may be laid, such quantity of water as
they may desire, and the water company shall
have the right to charge the citizens therefor for
such water as may be supplied them as much
and no more than the average price paid therefor in
other cities of the United States having efficient water-
works; provided that in case the city council and the
water company disagree upon a schedule of prices to be
paid by the citizens thereof, then such rates and
charges shall be ascertained and determined by five
disinterested persons, two of whom shall be chosen by
the city council, two by the water company, and the
fifth by the four thus chosen, and the rates thus fixed
shall remain in force until altered by agreement or
arbitration, as aforesaid, and either the city authori-
ties, through the city council, or the water company by
its president and directors, may demand an adjust-
ment of said rates at any time after the expiration of
one year from the last preceding adjustment; provided,
however, that pending any such disagreement or
adjustment of rates, the company shall continue to fur-
nish water to the city and citizens thereof, and shall
be entitled to receive pay therefor at the rates that
may be agreed upon as above provided.

"Sec. 7.    That the city shall pay to said company
for the use of the hydrants and water therefrom as
hereinbefore mentioned and specified, the yearly rent
of $2,000 per mile for the first five miles of water mains
laid, and the sum of $1,500 per mile for the second five
miles of water mains so laid, and for such additional
mile thereafter laid by the order of the city council,
the city shall pay such annual rent per mile as the city

and company can agree upon, and in case of disagreement, the same to be fixed by arbitration as provided in section six (6) of this ordinance, the same not to exceed in cost the sum of $1,400 per mile, said rent to be paid semi-annually; that after the expiration of twenty years from this date, at the option of the city, the rates above specified shall cease, and thereafter said city shall pay to said company for all water furnished the average rates paid by other cities of the United States having efficient waterworks operated by private companies; the amount, in case of disagreement, to be settled as provided in section six (6) of this ordinance."

Soon after this ordinance was passed it was amended by making a correction in the name of the company, and by providing that the compensation for furnishing water to the citizens should be the average price paid in other cities of the United States having efficient waterworks operated by private companies. The only change effected by this amendment was to apply the same rule or method of fixing the price to be paid by the city, for public uses, and to the inhabitants, for private use. These ordinances were accepted by the water company, and the construction of the works was immediately commenced and soon thereafter put in operation. Negotiations were opened with the city for the purpose of fixing rates for private consumers, and on the fifth day of December, 1871, a resolution was passed by the city council prescribing the rates agreed upon between the city and the company. This schedule of rates was accepted in writing by the company, and the water company furnished water, and was paid therefor according to the schedule of rates thus agreed upon, until the year 1880, when the company was reorganized, with a larger capital, and its entire property was sold and conveyed to the new organization, known as the Des Moines Waterworks Company; and the

plant has ever since been operated under that name, and has at all times been recognized by the city and by the company as the lawful successor of the original company, in law, in obligation, and in right; and at about that time there was complaint as to the proper performance of its obligations by the water company, and on the fifth day of June, 1883, there was a read-justment of the public rates by the enactment of an ordinance amending the original contract and ordinance. This amendatory ordinance is in these words: "Sec. 7. That the city shall pay to the Des Moines Waterworks Company for the pipes now laid the annual rental of $15,000 payable semi-annually, and in addition thereto, a sum of money annually equal to the amount of all taxes and assessments levied annually, for all purposes, upon all the property of said Des Moines Waterworks Company during the continuance of this contract. Said taxes to be paid annually on the first day of February in each year by the city to the county treasurer, and for the first five miles of extension of mains made from and after the first day of January, 1883, the city shall pay to said Des Moines Waterworks Company the sum of $750 per mile per annum, the rentals payable to the said waterworks company, under this section, shall be paid on the first of January and July of each year, and if there shall be water funds in the city treasury, said payments shall be made monthly. That after the expiration of ten years from January 1, 1883, at the option of either party, the rates above specified shall cease if either party shall so elect; from and after said election said city shall pay to said company for fire protection and all water furnished the average rates paid by other cities in the United States having efficient waterworks operated by private companies, the amount, in case of disagreement, to be settled as provided in section six (6) of said ordinance. It is further

provided that the company shall not be required to lay
to exceed two miles of pipe in any one year, all pipes
for extension shall not be less than six inches in diam-
eter except from street mains to hydrants. It is
further provided that the waterworks company shall
furnish water in not to exceed ten troughs or basins to
be furnished by the city with such devices or attach-
ments as shall prevent the continuous flow and
unnecessary waste of water. It is further provided,
that this amendatory ordinance shall be in force from
and after its publication and its acceptance of the pro-
visions thereof by the Des Moines Waterworks
Company."

This ordinance was accepted by the company, and
after that time additional extensions of the water
mains were, from time to time, ordered; and agree-
ments were made, by resolutions of the council and
acceptances by the company, of the amount of compen-
sation to be paid for such extensions. On November
12, 1888, the city council, by a resolution, ordered cer-
tain extensions of mains, and named the sum to be paid
for the next ten miles of extensions to be six hundred
and fifty dollars per mile. On the sixth day of Decem-
ber, following, the rate of compensation was accepted
by the company, in writing. We merely cite this as
one of the instances showing that there was not, at
any time, any fixed and unalterable standard of rates.
They were subject to readjustment as the extension of
the waterworks progressed. At least, such appears
to have been the understanding of the parties. This
ordinance which caused all this litigation is general
in its terms. It does not purport to be an adjustment
of the rates to be paid to the Des Moines Water Com-
pany. Section 1 is as follows: "That every person,
firm, or corporation furnishing to the city of Des
Moines and its inhabitants water for fire protection,
domestic uses and manufacturing purposes and other

uses and purposes, shall be entitled to charge and receive therefor, and for the use of water meters, the rates and prices herein fixed, and no more." It is true that there are other provisions in the ordinance, aside from the schedule of rates, such as requirements for efficient pressure of water for the extinguishment of fires, and requiring tests to be made for the efficiency of the works in that respect. And there is also a requirement that water meters shall be furnished to private consumers upon application. This ordinance in no manner, either generally or specially, directly or indirectly, questions the original ordinance and contract made with the Des Moines Water Company in the year 1871, nor the subsequent ordinance and resolutions adjusting the rates to be paid for water from time to time as the pipes were extended. There is no evidence in any of the cases tending to show that the defendant failed to furnish pure and wholesome water; and, while the records of the city council show that at times there was complaint and dissatisfaction with the manner of service, there is nothing in all these records from which it may be inferred that the city desires that the present company shall cease to operate the works, or that there is any purpose to attempt, by any proceeding, to compel the company to remove its pipes from the streets and alleys, or to authorize any other company to establish waterworks in the city. On the contrary, the very purpose of the equity case commenced by the city upon its own motion, and heard and determined before either of the other suits were commenced, was to compel the company to continue its water service. It stands out, all through the records made in these cases, and in the arguments of counsel, that the only real contention between the parties relates to the

water rates. The following language is used in the closing argument in behalf of the city: "The company has already enjoyed its franchise for a term longer than many of the contracts which have been held void as unreasonable. No attempt is made to assail it now, or to deprive the company of the full enjoyment of the control and operation of its works. We only contend that, in so using its property for a public service, it shall submit to the regulation of its rates by the proper authorities." This thought is repeated again and again in the arguments. And the record shows that after the ordinance in question had been passed the water company addressed a communication to the mayor and council, which was placed on file. The said writing contains the following, among other, propositions: "This company further desires to call to your attention the fact that immediately after the passage of Ordinance No. 106, passed May 1, 1871, the city council, by agreement between it and this company, passed a resolution establishing the water rates for private consumption; that said rates have ever since been, and are now, in full force and effect, and this company has not demanded a readjustment thereof; that the city council has not at any time, or in any manner, asked or demanded of the company a readjustment of said rates; that it has not at any time, or in any manner, entered into any negotiation or consultation for a readjustment of the same; and that it has not at any time, or in any manner, disagreed with the company respecting the said rates. The company desires further to say that it is entirely willing that the water rates mentioned in section 6 of said ordinance shall be fixed in the manner provided in said section 6, together with its amendment; that if the city council shall demand a readjustment thereof, and if, thereupon, the council and the company are unable to agree, then arbitration shall take place, as provided

in said section and its amendment. It not only announces its willingness to pursue such course, but, if the city desires a readjustment, it demands that the city pursue the same. The company desires further to say with respect to the water rates mentioned in section 7 of said ordinance, being chapter XXVII. of the Revised City Ordinances of 1889, that the city of Des Moines has not at any time, or in any manner, elected that the rates therein specified shall cease; but, if the city desires to so elect, the company is willing, if the parties are unable to agree, to proceed to determine the said rates by arbitration as therein provided, and it not only announces its willingness so to do, but, if the city desires that the existing rates shall cease, it demands that the city pursue such course."

Now, it may be that these propositions are not conclusive as to the rights of the company, because they are in the nature of offers of compromise. But they are in exact line with the thought that the company has no right, by contract, ordinance, or resolution, to resist a lawful adjustment and regulation of the rates. The fact that the original ordinance granted an exclusive right to furnish water for forty years, as we have seen, is not a material question in the case. It will be time enough for the company to call upon the courts to protect it from an abridgement of a supposed contract or constitutional right when an attempt to deprive it of such right is made. Its contract with the city was that the rates should not be one unalterable standard for forty years. If such a contract had been made, it might admit of very serious doubt whether it could be sustained. By the census of 1870 the population of the city of Des Moines was about twelve thousand, in 1880 it was twenty-two thousand, in 1890 it was fifty thousand, and it is now a city of about sixty thousand inhabitants. A contract binding the city to the initial rate for forty years from 1871, and up to the

year 1911, might, and probably would, be held to be so
unconscionable and unreasonable that it could not be
enforced.  The price to be paid for the water service
was, no doubt, left subject to adjustment from time to
time because it was evident that the growth of the city
would enable the company to furnish the water at much
less cost than when the plant was established.  The
facts we have recited show that any contract right it
had to maintain a standard of rates expired in the year
1893 by limitation, and it had no right to resist a
proper and lawful readjustment of the rates.

7       We have, then, the question whether it was
within the power of the city to fix an absolute
standard or schedule of rates.  The representatives of
the city contend that it has such authority, and the
company insists that it has not, but that it must pursue
the method provided for in the ordinance of 1883.  The
position of counsel for the company is that, without a
compliance with the ordinance in the matter of adjust-
ing the rates by arbitration, the rates fixed by the
ordinances and resolutions previously adopted must
control; and it was upon that theory that the actions
at law to recover the rates previously in force were
commenced, tried, and decided.

III.  We now come to consider what is known as
the "arbitration of the rates," provided for by the
ordinances in case the parties could not agree upon a
schedule of rates.  As we have said, the time had come
to readjust the rates on the demand of either party.
The material question, in this feature of the contro-
versy, is whether the city was bound to take the steps
to organize a board of arbitration.  That the parties
refused to agree upon a schedule, cannot be questioned.
This litigation, and the facts disclosed in the record,
abundantly establish that proposition.  The conten-
tion of counsel for the city is that the agreement con-
tained in the ordinances to submit differences that

might arise to arbitration is void, and that it could not be compelled to choose arbitrators; that it had the right to ignore that agreement, and fix the rates by an ordinance. It has been quite uniformly held that a stipulation in a contract, that all disputes which may arise in the matter of the performance of the agreement shall be settled by arbitration, cannot be enforced. The rule is stated as follows in 1 Am. & Eng. Enc. Law, p. 667, note 1: "Parties cannot oust the courts of their jurisdiction by embodying in a contract the stipulation that all disputes and controversies which may arise on the contract shall be submitted to arbitration, and that the award of the arbitrators shall be final." This court approved of that rule in the late case of *Prader v. Accident Ass'n,* 95 Iowa, 149 [63 N. W. Rep. 601]. There is another general rule, that parties to a contract may stipulate that some particular fact or facts which may be the subject of controversy between them, shall be determined by some third person or persons, and that such an agreement is valid. See *Prader v. Accident Ass'n, supra.* And see, also *Ross v. McArthur,* 85 Iowa, 204 [52 N. W. Rep. 125]; *U. S. v. Robeson,* 9 Pet. 319; *Smith v. Brady,* 17 N. Y. 173; *Railway Co. v. Polly,* 14 Grat. 447; *Smith v. Railway Co.,* 36 N. H. 458; *Faunce v. Burke,* 16 Pa. St. 469; *Hudson v. McCartney,* 33 Wis. 331. These, and many other cases which might be cited, are not founded upon contracts which are strictly agreements for the arbitration of disputes; nor is the determination an "award," as that term is usually understood. If the parties to the agreement under consideration had provided that, in case of a dispute as to the readjustment of the rates, it should be settled by arbitrators chosen as provided for in the ordinances of the city, we are not prepared to hold that the readjustment so made would not be valid and binding on the parties. And it may

be that the party refusing to enter into arbitration would have no standing in an action in which the water rates were involved. But the stipulation as to rates fixes the price to be paid for water supplied to the city and its inhabitants "as the average price paid therefor in other cities of the United States having efficient waterworks operated by private companies." This provision is claimed by the water company to be part of what it insists is a contract. If arbitrators had been chosen, they were not to determine the rates by a reasonable compensation for the service, but by an average of the prices paid "in other cities of the United States having efficient waterworks operated by private companies." It is perfectly manifest, when the whole stipulation is considered, that it ought not to be held to be enforceable, as the proper manner of ascertaining what would be a reasonable and just compensation for the service. This cannot be fixed by an indiscriminate average of the rate in other cities of the United States generally. It is apparent that, while such a stipulation is not absolutely impossible to be performed, yet, as between the city and its inhabitants and the water company, it is so indefinite, impracticable, and unreasonable, in the method prescribed for ascertaining the rates, that it ought not to be sustained. And we can discover no reason why we should uphold part of this stipulation, and reject that part which provides for the method of fixing the rates. Our conclusion on this question in the case is that the water company has no right to the enforcement of the arbitration clause, and that the rates, in case of disagreement, is a matter of judicial inquiry. And when the question comes to be determined by a judicial tribunal the true inquiry should be, what would be reasonable rates, or, in other words, what would be fair compensation, for the service, taking into consideration all the facts bearing upon that question? We are

the more ready to dispose of this question in this way because it effectuates a just result, for no person or corporation ought to be allowed to demand more for a public service than reasonable compensation. Such a measure of the value of the service is not only in harmony with natural justice, but it accords with the recent legislative policy of this state.

IV. If the city was, as we have found, under no obligation to select arbitrators, it remains to be determined whether it had the right to fix an absolute schedule of rates, by which the water company was bound. The principal part of the arguments of counsel are devoted to what is denominated the "rights reserved to the city as the representative of the sovereignty of the state." It is urged in behalf of the city that it had no authority or power to enter into the contract made by the ordinance of 1871, because there was then no legislation which authorized such a contract to be made. Counsel for the water company contend that there was such authority, and, if in error in this, they claim that the contract was validated and approved by an act of the general assembly passed in 1872. We will not set out the statutes which are the basis of these claims, because, as has already been stated, there is no obstacle in the way of a legal readjustment of the rates. It is due to counsel for the company that we should state that they claim, in the most emphatic terms, that the exclusive character of the contract is in no wise drawn in question in this controversy. They state that proposition as follows: "No other company has received authority from the city to use its streets for pipes, nor is the city itself attempting to exercise such right; and our first proposition in this behalf is that the discussion of the power of the city of Des Moines to grant the exclusive right for a period of forty years is wholly irrelevant, and the inquiry ought to be eliminated from the case. It will

be time enough, when either the city or any other company claims to share the privilege, to determine whether our agreement in that respect is valid, or otherwise. The views of counsel, and their abstractions, cannot be substituted for the official acts of the municipality itself. The only municipal act relating to this subject, and which forms the foundation for all of these suits, is the ordinance of 1893, which does not attempt to reclaim any part of the right granted by the ordinance of 1871, but is simply an attempt to regulate the price that shall be charged by the company for its services. It is a recognition, rather than a disaffirmance, of the privilege previously granted. If the city had passed an ordinance endeavoring to repeal that part of our contract which insures to us the sole occupation of the streets for water purposes, and some other agency was about to interfere with the privileges we have enjoyed, then the question would fairly arise. It is possible, also, that if a tax payer of the city, responsible for his averments, were to institute an action showing some legal damage, the subject might be open for judicial investigation. But neither of these things exists." It will be observed, from what we have stated, that we concur in these propositions of counsel, and we must decline to determine questions which the cases do not present; and we are thereby relieved of the examination and citation of a large number of adjudged cases upon the scope of the powers of incorporated cities and towns, in reference to the reasonableness of contracts of this character. There is no doubt of the power of the state to regulate the compensation to be paid to corporations in the exercise of a public service or employment, in the absence of any schedule of prices fixed by an arrangement in the nature of a contract. This right has again and again been sustained, in numerous cases determined by the supreme court of the United States, as applicable to

railroad freights and charges, and to persons and corporations engaged in other public service.   We need not cite the cases.   They are familiar to the profession.

We must put some limit to this opinion.   But no court has ever yet announced the doctrine that the regulation of rates may be such as would be unreasonable or unjust.   In the case of ·Chicago, M. & St. P. Ry. Co. v. Minnesota, 134 U. S. 418 [10 Sup. Ct. Rep. 462, 702], it was held that the state of Minnesota could not confer upon a board of railway commissioners the power to prescribe a tariff rate absolute in itself.   The principle involved in that case cannot be successfully assailed.   It is claimed that under article 8, section 12, of the constitution of this state, which authorizes the legislature to amend or repeal all laws for the organization or creation of corporations, or the granting of special or exclusive privileges, and under section 1090 of the Code, the absolute character of the ordinance may be sustained.   We do not concur in this view.   As applied to the question of the rates and charges for furnishing water, if the contention of counsel for the city should be sustained, it would be within the power of a city council to lower the rates so as to bankrupt the company, or to raise them so high as to rob the private consumers and bankrupt the city. These powers to fix rates and to control corporations must be so construed that no injustice will be done in the matter of rates.   And although chapter 16, Act 1888, provides that the councils of certain cities shall have power to fix the charges for furnishing water, gas, electric light, steam heating, and provides that the act "shall not be construed to authorize the passage of an ordinance or resolution or the making of any contract whereby the above powers are abridged," must be held to authorize the fixing of reasonable rates.   To give such a statute an absolute effect would be as plainly unconstitutional as the statute of Minnesota declared

to be void in *Chicago, M. & St. P. Ry. Co. v. Minnesota,*
*supra.* In *Stone v. Trust Co.,* 116 U. S. 307 [6 Sup. Ct.
Rep. 334, 388, 1191], the principle that the rates estab-
lished must be reasonable is well stated in the follow-
ing language: "From what has been said, it is not to
be inferred that this power of limitation or regulation
is itself without limit. This power to regulate is not
a power to destroy, and limitation is not the equivalent
of confiscation. Under pretense of regulating fares
and freights, the state cannot require a railroad cor-
poration to carry persons or property without reward;
neither can it do that which amounts to a taking of pri-
vate property for public use without just compensa-
tion, or without due process of law." It is to be remem-
bered that the property of the water company is not
mere commodity, which can, without material cost, be
transplanted, and put in operation elsewhere. Its
value consists largely in the matter of its location, and
in the more than sixty miles of water pipes laid below
the frost line in the city, and in machinery and appli-
ances which are of value mainly because of the present
uses to which they are applied. The principle that an
ordinance must be a reasonable exercise of power, and
not repugnant to fundamental rights, is no new doc-
trine. By the general power authorizing cities to
impose licenses upon certain trades or occupations,
they are required to be reasonable, fair, and not oppres-
sive. Dill. Mun. Corp., sections 253, 254. *Town of*
*State Center v. Barenstein,* 66 Iowa, 249 [23 N. W. Rep.
652].

V. In the equity case it was stipulated by the
parties as follows: "For the purpose of this hearing
upon plaintiff's application for a temporary injunction,
but no further, it is stipulated: (1) It is agreed
that defendant will offer no evidence upon the
question whether the rates established by the
ordinance of January 23, 1893, are reasonable rates,

and that the ordinance of January 23, 1893, (if valid) is, as a matter of law, *prima facie* evidence that the rates therein prescribed are reasonable rates. (2) It is admitted by plaintiff that the rates established by the ordinance of January 23, 1893, are below the average rates in other cities in the United States having efficient waterworks. (3) It is admitted by plaintiff that the rates established by the ordinance of January 23, 1893, are below the average rates in other cities in the United. States having efficient waterworks operated by private companies. This stipulation is made to avoid the necessity for introducing any testimony upon said questions, which the parties are not now fully prepared to furnish, but shall not in any future proceeding in this court, or on final hearing or trial, be considered as evidence, nor to excuse, in any degree, either party from producing evidence; and the respective parties expressly reserve the right to deny the said matters, or any of them, in all future proceedings in this court, or trials." In the view we have taken of the case, as heretofore shown, the court should have granted the temporary injunction upon this stipulation. It was an agreement between the parties that the ordinance was, as a matter of law, *prima facie* evidence of reasonable rates, and it was in no manner rebutted by any evidence. And in the law cases we think it should have been held, as a matter of law, that the ordinance was, *prima facie*, a schedule of reasonable rates; and, as the plaintiff was allowed to recover without in any manner attacking or rebutting the presumption, the judgments should be reversed. The appeal was taken in the equity case from an order overruling a temporary injunction. That order is reversed, and the cause is remanded for trial upon its merits.

VI. There is one other phase of the controversy which requires consideration. The corporate limits of the city of Des Moines were extended in 1890 so that

three adjacent incorporated towns were annexed to the city of Des Moines. The towns were named "North Des Moines," "Greenwood Park," and "University Place." Before the annexation, and in the year 1887, the town of North Des Moines entered into a contract with a water company known as the North Des Moines Water Co. for the furnishing of water for the use of that town and its inhabitants. The ordinance or contract was full and elaborate, and contemplated an independent plant. Afterwards, in the month of October, 1889, another ordinance was passed, and agreement made, which was designated as an amendment to the original ordinance; but it was in fact altogether another contract, and contemplated an entirely different service. The towns of University Place and Greenwood Park took some action in reference to supply of water to be furnished by a corporation known as the Des Moines Water-Supply Company. These negotiations and arrangements were not carried out by the erection of any independent water works in any of the suburban towns. No system of works was built, but the water was furnished by a connection with the pipes of the Des Moines Waterworks Company, and soon after the connections were made the outside companies assigned whatever rights they had to the Des Moines Waterworks Company. It is claimed by the water company that the rates established by the towns in the preliminary contracts cannot be affected by the extension of the city limits. The proposition cannot be sustained, as to the two last above named towns, if for no other reason, because there is no competent evidence that any valid contract or arrangement was made with the water-supply company. And we may say, briefly, without a further statement of facts or discussion of questions of law presented, that we can discover no rea-

son why the same rule should not apply to the whole territorial limits of the city of Des Moines, without regard to annexation of territory thereto since the original ordinance was passed.

VII.    Other questions than those considered have been discussed by counsel, one only of which we think it is necessary to mention: Counsel for the city make the proposition that any rate contracted for in excess of the five-mill levy of tax authorized by statute is void. We do not think that question can be allowed to enter into the controversy. It has no merit, and is mentioned here only for the purpose of the future guidance of the parties in fixing rates upon a trial, if the parties should fail to agree upon rates upon the lines laid down in this opinion. It is apparent that such an agreement should be made, in view of the many difficulties attending the establishment of exactly reasonable rates by a judicial proceeding.

VIII.    A motion to dismiss the appeals was filed with the submission of the causes. The ground of the motion is that the city has paid for the water service since the appeals were taken. The motion is overruled, for the reason that the payment made did not exceed the amount admitted to be due under the ordinance. The decrees and judgments of the district court are *reversed.*