Marshall, C. J.
 

 The foundation of the claim of the relator in this case is that the rate established by the arbitrators is oppressive and unreasonable. Except for this claim, there would be no right, and the city would therefore be entitled to no remedy.
 

 This is not an error proceeding to review the report of the arbitrators to determine whether the rate which they have agreed upon is reasonable and lawful; this court is not called upon to determine! whether a wrong conclusion was reached by the ar-i bitrators, but rather to determine whether the ques-, tion of the reasonable cost of the transportation': service for the 5-year period from 1928 to 1933 was | properly and legally submitted to the arbitrators. Í
 

 First of all, a procedural question is submitted. The railway company challenges the right of a taxpayer to bring this suit under and by virtue of Section 4314, General Code. It is claimed that whatever results are reached about the cost of transportation service, and whether the rates are high or low, does not affect taxpayers. It is claimed on the one hand that the language of the section' is broad enough to include any matters which involve an alleged abuse of corporate powers or the execution or performance of any contract, whether or not it involves a misappropriation or misapplication of funds of the corporation. It'is claimed, on the other hand, that the statutes in question are merely declaratory of the common law, and that taxpayers can
 
 *86
 
 only sne in those matters involving waste or unlawful diversion of public funds. We are of the opinion that the legislative intent is not to be narrowed to the mere matter of waste or unlawful diversion, but that the statute was intended to cover the execution or performance of
 
 ultra vires
 
 contracts by municipal officers, and to prevent usurpation by public bodies or agents of powers not granted, the exercise of which may imperil the public interest. The statute, being remedial in nature, should be construed liberally. Upon the authority of
 
 Butler, Taxpayer,
 
 v.
 
 Karb, Mayor,
 
 96 Ohio St., 472, 117 N. E., 953, the right of the taxpayer to maintain this suit must be sustained.
 

 By an amendment to the answer, the railway company pleads that, when the franchise contract of 1918 was entered into, the railway company already had a franchise covering certain streets of the city of East Cleveland, and by its terms it did not expire until 1921, and that the former franchise was surrendered as a part of the new franchise contract of 1918. The amendment further alleges that, by reason of the new grant, the railway company obligated itself to pave additional streets for a width of seventeen and one-third feet, and to rebuild its tracks and equipment, and that, since said contract of 1918 was entered into, the railway company has expended upon its system in the city of East Cleveland approximately $1,500,000. It is further alleged that one of the inducements to making the contract on the part of the city was the great need of repaving and the need of improvements in the service. It is further alleged that the railway company declined to accept a grant from the city for a period of 25
 
 *87
 
 years for a fixed rate of fare throughout that period, and only entered into the contract involving large expenditures for improved equipment, for extensive repavements, and the disbursement of large sums of money, because of the agreement for the protection of the 5-year rests and the arbitration clause in the contract whereby the rate of fare could be adjusted from time to time with reference to the cost of service.
 

 All these matters are of great importance in determining the character of the transaction and in stamping it as a contract entered into upon an adequate consideration, but, inasmuch as the taxpayer in this case is only challenging the legality of one feature of that contract, and questioning the right of the city to enter into that feature of the contract at all, it must be held that no estoppel is created.
 

 The original answer raises a more serious question of estoppel. It alleges that, after the notice served upon the city by the railway company, on December 12, 1927, demanding an arbitration on the rate of fare for the 5-year period next ensuing after June 19, 1928, the city by its officials recognized the right of the railway company to an arbitration, and numerous conferences were held in an effort to agree upon rates of fare for said 5-year period, but that they were wholly unable to agree, and thereupon the city fully co-operated with the railway company in the appointment of arbitrators, and participated in the hearing before the arbitrators, extending over a period of two or three weeks, and presented evidence involving data and expert knowledge. It is therefore claimed that the city of East Cleveland has had its day in court and its opportunity to be
 
 *88
 
 fully heard, and, all contentions having been fully considered without objection on its part, and having sought a favorable decision at the hands of the arbitrators, it should not now be heard to complain of an unfavorable decision, if in fact the decision has been unfavorable. The situation is rendered still more difficult for the city of East Cleveland by the fact that the city does not even yet question the right to an arbitration, or the results of the arbitration, and is even participating in this proceeding in opposition to the claims of the taxpayer.
 

 Whether or not the,arbitration clause in the contract of 1918 was an agreement to arbitrate a controversy which could not arise until the lapse of 5, 10, 15 or 20 year periods, it is quite certain that the rates established in 1918 were only binding and conclusive upon either party during the period from 1918 to 1923, and after the arbitration of 1923 were only conclusive until 1928. It follows that, when the notice was served in 1927 by the railway company, there was a present issue which by the terms of the franchise contract was required to be determined in some manner. If it be assumed for purposes of argument that the agreement of 1918 was not binding upon the city in 1918, it must nevertheless be conceded that, when the possibility of an issue had developed into a real issue in 1928, the city could agree to submit that issue to arbitration, and this is true whether that issue was one which called for a judicial determination or was merely one of appraisement or fact finding. If the arbitration clause was invalid on the ground that it was made at a time when there was no present dispute, the city might have refused to submit to arbitration, but, there be
 
 *89
 
 ing an issue in 1928, and the city having participated in the determination of that issue, and having taken its chances upon a favorable outcome, it is now too late to complain that it was not bound to thus submit it. An unsuccessful party may not thus gamble either with an adversary or a tribunal. A taxpayer appearing on behalf of the city, after the matter had been clearly determined, is in no better position. There being a real dispute in 1928, which the parties were unable to adjust by negotiations, there being a selection of arbitrators, a submission, and an award, the city itself, as well as any taxpayer on behalf of the city, will be estopped to question the regularity of that submission and award.
 

 We are now brought to the major question in this controversy.
 

 Briefly stated, it is the claim of relator that the determination of proper rates of fares is a legislative function which rests solely with the legislative authority of East Cleveland, and that it cannot be delegated to arbitration. Whether this controversy was properly submitted to arbitration depends upon many elements, each of which must be decided. First of all, we shall inquire whether, regardless of the public character of the dispute, an agreement could be made in 1918 to submit to arbitration an issue which could not possibly arise until 1923, and which was settled by arbitration in 1923, and which could not thereafter arise until 1928. The general rule on this subject is clearly and concisely stated in 5 Corpus Juris, 27:
 

 “The decided weight of authority is to the effect •that an arbitration, strictly speaking, has to do with the settlement of existing controversies between
 
 *90
 
 parties. If there is no matter in dispute, there is no question for an arbitration. This principle applies to statutory as well as to common law arbitration. It seems to be essential to the very idea of an arbitration that there should have been an antecedent dispute or controversy between the parties.”
 

 If, therefore, this language be accepted without qualification, and if the submission in the instant j: case was technically speaking an arbitration, it f would seem that it was wholly unauthorized. On the other hand, an examination of the authorities which are cited in support of that text throws a different light on the matter. One of the cases cited is fthat of
 
 Green & Coates Streets Passenger Ry. Co.
 
 v.
 
 Moore,
 
 64 Pa., 79, wherein it was held that a mere ; appraisement, and determination of the rights of ; property, is not strictly speaking an award. A dis- ! tinction is drawn in the opinion between disputes ■ arising out of the legality of the contract itself, or ; whether or not it was being breached, which might be the subject-matter of an award, and the determination of the value of property where the parties to the contract have agreed that the sale price might be fixed by an appraisement to be made by third persons, which is declared to be only an appraisement.
 

 In
 
 Toledo Steamship Co.
 
 v.
 
 Zenith Transportation Co.,
 
 184 F., 391, decided by the Circuit Court of Appeals of the Sixth Circuit, it is said:
 

 ; “To constitute an arbitration, the matter submitted must be one in dispute between the parties, and not some matter which it is expected may arise between them or a matter of accounting or appraisal. ’ ’
 

 In
 
 Memphis Trust Co.
 
 v.
 
 Brown-Ketchum Iron Works,
 
 166 F., 398, the Circuit Court of Appeals of
 
 *91
 
 the Sixth Circuit had under consideration a building contract, and it was declared:
 

 “Where a building contract provided that the architect should determine finally all matters in dispute and that final settlement should be had and payments made on architects’ certificates, such provisions were not merely, collateral, but were of the essence of the agreement, and could not be revoked by either party, but actual or tendered compliance was a condition precedent to a recovery thereon.”
 

 In the opinion, at page 403, it is stated:
 

 “When in express terms or by necessary implica-
 
 j
 
 tion the parties have stipulated that arbitration as / to the amount of the loss shall be a condition prece
 
 dent
 
 to recovery upon the policy, no action can be
 
 maintained
 
 without actual or tendered compliance
 
 j
 
 with that stipulation.”
 

 In support of its conclusions, a very large number of cases are cited, including many decisions of the United States Supreme Court.
 

 . In
 
 City of Omaha
 
 v.
 
 Omaha Water Co.,
 
 218 U. S., 180, 30 ,S. Ct., 615, 616, 54 L. Ed., 991, 48 L. R. A. (N. S.), 1084, it is stated:
 

 “An arbitration implies a difference, a dispute, and involves ordinarily a hearing and all thereby implied. The right to notice of hearings, to produce evidence and cross-examine that produced is implied when the matter to be decided is one of dispute and difference. But when, as here, the parties had ¡ agreed that one should sell and the other buy a j specific thing, and the price should be a valuation 1 fixed by persons agreed upon, it cannot be said that there was any dispute or difference. Such an arrangement precludes or prevents difference, and is
 
 *92
 
 not intended to settle any which has arisen. This seems to be the distinction between an arbitration and an appraisement, though the first term is often used when the other is more appropriate. ’ ’
 

 It is not deemed necessary to discuss or even cite any of the other numerous cases which support this distinction.
 

 The conclusion to be drawn is that to constitute a valid common-law award there must be a submission ■ of an existing matter of difference for the purpose of concluding the parties as to the entire subject-matter in issue between them, as distinguished from the submission for the ascertainment of a single fact or the settlement of a particular question in the chain of evidence constituting a mere appraisement, valuation, or reference not designed to terminate the whole controversy between the parties. This principle is clearly stated in
 
 Sebree
 
 v.
 
 Board of Education,
 
 254 Ill., 438, at page 446 of the opinion (98 N. E., 931, 935):
 

 “The terms ‘appraisement’ and ‘arbitration’ are sometimes used interchangeably and frequently without any clear difference in meaning. There is, however, a plain distinction between an appraisement and an arbitration. * * * Arbitrators generally proceed in a quasi judicial manner to settle the dispute. Their jurisdiction is in the nature of a judicial inquiry, and certain rules of procedure must be observed or the award will be void. On the other hand an appraisal is the proper term to be used when an appraisement or valuation is to be made as auxiliary or incident to a contract. The appraisers are selected to preclude or prevent, by appraisal,
 
 *93
 
 the arising of differences, and not to settle differences which have already arisen.”
 

 In the case at bar there was no claim of forfeiture or damages for breach of the contract. The city and the railway company each recognized the validity of the contract. Neither complained of any breach of its terms and conditions by the other. Each desired that the service continue. At the inception of the contract, in 1918, both agreed that the cost of the service would vary according to the price of materials, the. cost of labor, and the extent of the service, and that therefore adjustments might be necessary, and, to prevent a dispute from arising, each was accorded the right to call for such adjustment at the end of each 5-year period during the continuance of the franchise. It was not a right or duty which was being breached, and which called for a judicial inquiry. The language of the ordinance is that “the rate of fare shall be arbitrated,” which is only stating in effect that “the cost of serv-. ice shall be appraised.”
 

 The principle that parties are not bound by their agreement to submit future controversies to arbitration has never been declared by this court, but that principle was declared in Section 16, Article I, of the Ohio Bill of Bights, wherein it is stated: “All courts shall be open and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law,” etc.
 

 That constitutional provision has not, however, prevented parties from submitting a present contro7 versy to arbitration, but, on the contrary, the Legislature has expressly authorized arbitration in Sections 12148 to 12160, inclusive, General Code.
 

 
 *94
 
 Counsel for relator seeks to avoid these well-settled principles on the theory that a determination of rates for public utility service is a legislative function, and that, when the power to fix and determine such rates is reposed in a city, the legislative authority of that city cannot delegate the power. It is not doubted, that, when legislative authority is reposed by the Legislature in the legislative body of a municipality, the municipality is without power to delegate its authority to others. Neither is it doubted that under certain circumstances the fixing of rates for public utility service is a legislative function. Those principles, however, cannot apply to cases where the rates are properly a matter of agreement, as distinguished from those cases where they may be fixed by legislative authority without the agreement or consent of the utility. The cases cited by counsel do not therefore sustain his position.
 

 The true distinction between that which is legislative, and therefore not to be delegated, and that which is purely administrative, is stated in
 
 Cincinnati, Wilmington & Zanesville Rd. Co.
 
 v.
 
 Commissioners of Clinton County,
 
 1 Ohio St., 77, by Judge Ranney:
 

 “The true distinction, therefore, is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made. ’ ’
 

 In the case at bar the city commission of East Cleveland performed a legislative act in determining to provide the service of transportation for its citi
 
 *95
 
 zens, the means and method to be employed, and the kind and character of the service to be rendered. These were questions of policy which were legislative, and therefore could not be delegated. The selection of the person or corporation to render the service, and the rates to be paid for the service, are administrative and contractual. The rates to be charged for the entire 25-year period might have been incorporated into the agreement, but surely it cannot be said that the city commission could dictate the rates to be charged without the concurrence and consent of the utility. Under the authority already cited, the reasonable rate to be charged could in the first instance have been submitted to some other authority to determine, but the parties were in fact able to agree upon the first 5-year period, and so it was agreed that subsequent periods of 5 years each might be determined by so-called arbitration'; but it was in fact an áppraisaí. It is an economic fact based upon universal experience, of which the courts may take judicial notice, that rates cannot be fixed in fairness to either of the parties to the contract for a long period of years. That which would be reasonable under certain economic and social conditions might be either inadequate or grossly excessive under other conditions in the course of a 25-year period. Our state Legislature has conferred upon the Public Utilities Commission the power to fix and determine rates which are reasonable and lawful to be charged by public utilities, in many instances, and this power is not dependent upon the consent of the utilities, but only subject to review by the Supreme Court on the question of reasonableness and lawfulness. This power in the
 
 *96
 
 commission is purely legislative. No such power has been conferred upon municipalities in regard to public utility service to be rendered to their inhabitants. It is true that the rates to be charged are an essential element of a municipal franchise granted to a public utility. But such rates are subject to the consent of the utility, and cannot be arbitrarily imposed by the munibipality.
 

 In making the contract in the case at bar in 1918, the city of East Cleveland was acting under and by virtue of authority given to municipalities by the constitutional amendment of 1912, found in Sections 4 and 5 of Article XVIII. Section 4, in part, provides:
 

 “Any municipality may acquire, construct, own, lease and operate within or without its corporate limits, any public utility the product or service of which is or is to be supplied to the municipality or its inhabitants, and may contract with others for any such product or service
 
 * *
 

 Section 5, in part, follows:
 

 “Any municipality proceeding to acquire, construct, own, lease or operate a public utility, or to contract with any person or company therefor, shall act by ordinance * *
 
 '*
 
 ” etc.
 

 "While it is provided in Section 5 that the city can act only by ordinance, this is for the purpose of permitting a referendum upon its action. The relation between the city and the utility is by both of those sections expressly declared to be contractual.
 

 That a public utility franchise is a contract has been many times declared by this court.
 
 Cincinnati & Springfield Ry. Co.
 
 v.
 
 Incorporated Village of Carthage,
 
 36 Ohio St., 631, 634;
 
 City of Columbus v.
 
 
 *97
 

 Street Ry. Co.,
 
 45 Ohio St., 98, 12 N. E., 651;
 
 East Ohio Gas Co.
 
 v.
 
 City of Akron,
 
 81 Ohio St., 33, 51, 90 N. E., 40, 26 L. R. A. (N. S.), 92, 18 Ann. Cas., 332;
 
 Interurban Ry. & Terminal Co.
 
 v.
 
 City of Cincinnati,
 
 93 Ohio St., 108; 112 N. E., 186.;
 
 Billings
 
 v.
 
 Cleveland Ry. Co.,
 
 92 Ohio St., 478, 490, 111 N. E., 155;
 
 City of Lima
 
 v.
 
 Public Utilities Commission,
 
 100 Ohio St., 416, 126 N. E., 318. This has also been expressly held by the United States Supreme Court in
 
 City of Cleveland
 
 v.
 
 Cleveland City Ry. Co.,
 
 194 U. S., 517, 534, 24 S. Ct., 756, 48 L. Ed., 1102, a case involving a public utility franchise in the city of Cleveland.
 

 A contractual relation between the city and the utility is wholly inconsistent with the theory that it is a legislative process in which the city may arbitrarily fix the price to be charged by the utility for its product and service. The cases cited by counsel for relator do not support his contentions. Those cases were decided in interpreting statutes and powers depending upon statutory regulations, where the statute did not authorize cities to enter into a contract relating to rates. In each of those cases the statutes under interpretation imposed upon the municipalities the duty to determine the rates, and it followed that that legislative authority could not be delegated. This is true of
 
 McNeely
 
 v.
 
 Town of Vidalia,
 
 157 La., 338, 102 So., 422;
 
 Freeport Water Co.
 
 v.
 
 Freeport City,
 
 180 U. S., 587, 21 S. Ct., 493, 45 L. Ed., 679;
 
 Home Tel. & Tel. Co.
 
 v.
 
 City of Los Angeles,
 
 211 U. S., 265, 29 S. Ct., 50, 53 L. Ed., 176.
 

 The distinction to be drawn between those eases where municipalities had arbitrary power and those where they only had the power to contract is
 
 *98
 
 clearly drawn in
 
 City of Red Wing
 
 v.
 
 Wisconsin-Minnesota Light & Power Co.,
 
 139 Minn., 240, 166 N. W., 175;
 
 City of Des Moines
 
 v.
 
 Des Moines Waterworks Co.,
 
 95 Iowa, 348, 64 N. W., 269;
 
 City of St. Louis
 
 v.
 
 St. Louis Gaslight Co.,
 
 70 Mo., 69;
 
 Wheeling Gas Co.
 
 v.
 
 City of Wheeling,
 
 8 W. Va., 320;
 
 City of Vicksburg
 
 v.
 
 Vicksburg Waterworks,
 
 206 U. S., 496, 27 S. Ct., 762, 51 L. Ed., 1155.
 

 The problem in the instant case is solved by the principle declared in
 
 Field
 
 v.
 
 Clarke,
 
 143 U. S., 649, at page 694, 12 S. Ct., 495, 505, 36 L. Ed., 294, where the court quotes with approval from
 
 Locke’s Appeal,
 
 72 Pa., 491, 498, 13 Am. Rep., 716:
 

 “The legislature cannot delegate its '(power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government.”
 

 If any further reason is necessary to be shown why the city of East Cleveland cannot as a legislative act fix and determine the rate to be charged, that reason is found in the fact that this particular public service franchise was not to be exercised wholly within the city of East Cleveland, but extended over 300 miles of track, beyond the corporate limits of the city of East Cleveland, and in the further fact that the rate was necessarily to have some relation to the rates charged in the city of Cleveland. The franchise contract of 1918, in Section 15 thereof, recites: “The acceptance of this ordinance by the company in the manner hereinafter provided shall be a contract between the City and the Company.” It being a contract, it- must be
 
 *99
 
 subject to all of. the attributes of a contract,' and be interpreted by all the rules of interpretation applicable to a contract. Tbe rates to be charged constitute the consideration to the utility. Those rates must necessarily be consented to by both parties to the contract. It cannot therefore be within the power of either party to the contract to either increase or diminish those rates without the consent of the other party. It may not be presumed that the railway company would have accepted the franchise, with its. attendant obligations to render service for the period of 25 years, having the rates determined for only 5 years of that period and leaving it to the city to arbitrarily fix the rates for the remaining 20 years. Agreeing only to the rates for the first 5-year period, and leaving the rates for the other four periods to an independent inquiry, inevitably leads to the conclusion that the rates for the future periods were to be reasonable rates, based upon the cost of the product and service and a fair return upon the investment. This was a fact finding process in the nature of an appraisal, and does not involve the rules of law to be applied to technical arbitrations and awards. If the contract had provided for arbitration of questions of breach of the franchise contract,-or any other matters relating to the validity of the contract, a wholly different question would be presented.
 

 The decisions of the lower-courts must be affirmed.
 

 Judgment affirmed.
 

 Jones, Matthias, Day,-Kinkade and Robinson, JJ., concur.
 

 Allen, J., dissents.