## THE STATE ex rel. ST. JOSEPH WATER COMPANY v. JACOB GEIGER et al., Constituting Board of Managers of State Hospital Number 2.

### In Banc, November 26, 1912.

1. **PUBLIC WATER: Rates: Public Use.** The business of supplying the public with water is a business impressed with a public use, and an ordinance fixing the rates for such supply is the exercise of governmental power.

2. ————: ————: **By Private Contract: Supplanted by Ordinance Rates.** In the absence of legislative action prescribing the rates for water supplied to the public, private parties may fix them by contract, and the rates so agreed upon will be upheld. But such rates remain in force only so long as the legislative body having power to fix the rates refrains from the exercise of its powers to prescribe the rates. When public rates are established by law, rates agreed upon by private contract must yield to the public rates. So that where the city of St. Joseph in 1900 entered into an ordinance contract with a water company by which it was agreed that "water shall be furnished to all private consumers at the same rate" for a period of twenty years and that rate was fixed at six cents per 1000 gallons, and in 1905 the board of managers of State Hospital Number 2, then outside the corporate limits of the city, entered into a contract by which said company agreed to supply the hospital with water for the ensuing ten years at the rate of ten cents per 1000 gallons, and in 1909 the corporate limits of the city were extended to embrace said hospital, the contract rate of ten cents per 1000 gallons was supplanted by the ordinance rate of six cents.

   *Held,* by GRAVES, J., dissenting, with whom FERRISS, J., concurs, that as a general rule ordinance rates for water should be, and by force of the law are, extended to territory subsequently annexed to the city. But that rule should not be applied, and cannot justly be applied, where it was agreed in the instrument by the board of managers of the hospital, then situated at a great distance from the city limits, that if the water company would at its own expense lay a water main to the hospital for the purpose of supplying water to it, the hospital would pay it ten cents per 1000 gallons for all water taken during a period of ten years, instead of the six-cent rate then fixed by the ordinance for supplying like quantities to persons within the city—the company having

fully performed its part of the contract, and the mains hav-
ing been laid without reference to streets in the terri-
tory subsequently added.

3. ——: ——: ——: ——: **Extending City Limits.**
When the boundaries of a city are extended, all ordinances and
municipal contracts of a general character, in the absence of a
special provision to the contrary, are simultaneously extended
over, and become operative in, the added territory, and such
territory becomes subject to the same burdens and entitled to
the same privileges as that within the original limits.

4. ——: ——: **Extension of Mains: Hydrants.** If the
water company, with the consent of the consumer, voluntarily
extends its mains and supplies him with water, the service,
regardless of the costs of the mains, must be done under an
ordinance which requires that "water shall be furnished to all
private consumers at the same rate." And those ordinance
rates are not affected by the fact that the ordinance required
the laying of mains and the placing of hydrants by the water
company, under the direction of the city, at intervals of 500
feet, if the company voluntarily laid a main without being di-
rected so to do by the city, or uses a main laid before the city
limits were extended.

5. ——: ——: **Legality of Contract: State Hospital: Po-
litical Subdivision of State: Indebtedness.** *Held*, by WOOD-
SON, J., that the State hospitals do not constitute the State
itself, nor are they simply a part or arm of the State, but are
political corporations and are embraced in that part of the Con-
stitution which declares that "no county, city, town, township,
school district or other political corporation or subdivision of
the State shall be allowed to become indebted in any manner or
for any purpose to an amount exceeding in any year the income
and revenue provided for such year," etc., and therefore the
board of managers of a State hospital had authority to make
a contract for the supply of water to the hospital for a period
of ten years at ten cents per 1000 gallons to be paid monthly as
used if the biennial appropriations made by the General As-
sembly for the use of the board were sufficient to pay those
accounts as they matured.

## Mandamus.

WRIT DENIED.

*John E. Dolman* for relator.

(1) The contract in question is analogous to con-
tracts for the public supply of water by municipali-

ties in which it is held "that no indebtedness of the city (within the meaning of Sec. 12, Art. 10, of the Constitution) accrues under the contract until the supply of water has been furnished, as agreed, year by year." Water Co. v. Lamar, 140 Mo. 145; Saleno v. Neosho, 127 Mo. 627; Water Co. v. Lamar, 128 Mo. 188; Water Co. v. Neosho, 136 Mo. 498; Trask v. County, 210 Mo. 596. The contract in controversy expressly provides that the "party of the second part hereby agrees to take its entire water supply from the St. Joseph Water Company . . . for the said Hospital No. 2 for a period of ten years from December 31, 1905, said water to be supplied by meter measurements and at the rate of ten cents per thousand gallons . . . payment for all water used to be made monthly," which provisions come squarely within the application thereto, of the authorities above cited. Sec. 1378, R. S. 1909, prohibits the contracting of any debt for which there shall not be at the time an adequate appropriation and Sec. 43, Art. 4, and Sec. 19, Art. 10, of the Constitution prohibit the payment of money except pursuant to regular appropriation therefor. No debt was incurred where the contract in question was entered into. Not until the water was actually furnished was a debt created. The payment therefor became due monthly as furnished for which payment together with other obligations necessarily incurred for the support and maintenance of the institution, ample appropriations have been made at each regular session of the General Assembly, including such an appropriation for the years 1911 and 1912. Laws 1911, p. 41. It is the incurring of a debt for which no appropriation has been made and the payment of unappropriated money that the statute and Constitution prohibit; and not the making of a contract which makes the incurring of a debt and the payment of money, contingent upon the furnishing of the article, for which the parties have a right to expect an appro-

priation, out of which payment may be made upon the happening of the contingency. Martin Co. v. Dubuque, 127 N. W. (Ia.) 1013; Walla Walla v. Water Co., 172 U. S. 1; City v. Water Co., 111 Pac. (Ore.) 864. (2) The State has in general the same power to contract as a corporation or an individual. 36 Cyc. 871. The contracts are usually made by duly authorized officers or agents and their contracts bind the State. Their authority need not be express but may be implied. 36 Cyc. 872. And the State can no more impair the obligation of an authorized contract than an individual. Woodruff v. Trapnall, 10 How. (U. S.) 190. And the fact that the contract extends beyond the life of the board making it, is not a valid objection. Pub. Co. v. Commissioners, 13 L. R. A. (N. S.) 1115; 3 Dillon on Municipal Corp. (5 Ed.), Sec. 1307. (3) The rule of law is undoubtedly correct that in accepting a franchise a water company acts not as a private but as a quasi-public corporation. It enjoys and must exercise its opportunities for gain subject to its obligation to the public in the absence of a contract fixing the rates that it will supply water without unjust discrimination and at uniform rates to all those along the lines of its mains who apply and tender a reasonable compensation. 30 Am. & Eng. Ency. Law, 426. The mains above referred to are public, not private. The contract between the city and the relator provides water shall be furnished to all private consumers at the same rates and no partiality or inequality in rates shall be permitted. These rates, however, are under the public contract with the city based upon an additional compensation of a hydrant rental for each five hundred feet of mains laid pursuant to the order of the city and other conditions. The pipe line in question was not laid pursuant to the city contract and could not be for the reason that at that time the State Hospital was at least a mile beyond the city limits and it is only by reason of the fact that since the limits of the city have

been extended so as to take in the hospital that the defendants claim the benefit of the public rate granted to those inhabitants who are located on one of the public lines described and provided for in the contract with the city. Under section 3 of the contract with the city, the city has the right to order a public line extended to the hospital under the terms and conditions therein expressed. When that is done the hospital will be entitled to the six per cent rate, and until that is done there is no such privity of contract between the water company and the defendants under the city contract, that would give the defendants any right to enforce the rates therein provided for. The city could not under its contract with the relator require the water company to furnish water to the defendants until it had ordered an extension of a public line to their institution and provided for the rental of the requisite number of hydrants as the contract provides—and if the city cannot do so neither can the defendants—to hold otherwise would be to permit the city through the defendants to violate the obligation of its contract with the water company and force it to maintain a private line over private property for public use, at public rates, without paying the hydrant rental provided for in its contract.

*Shinnebarger, Blagg & Ellison* and *Culver, Phillip & Spencer* for respondents.

(1) The board of managers had no power to make the contract with relator. The contract was made November 1, 1905, and provided that in consideration of the water company furnishing the labor and material necessary to lay the water main (which amounted to $12,000), the hospital should take its entire supply of water from the company for a period of ten years thereafter at ten cents per thousand gallons. The main was completed May 1, 1906. Neither at or

before the time the contract was entered into, or the main laid, was there any appropriation made by the General Assembly to pay for the water to be used, or for the main to be laid under the contract. The board of managers, therefore, had no power to contract any such debt or liability as was created by the contract. Constitution, Art. 4, Secs. 43 and 44; Art. 10, Sec. 19. It is conceded by counsel for relator that the board of managers had no authority under the Constitution to create any debt before the money necessary to pay it was appropriated for that purpose by the General Assembly. But he insists that the mere making of the contract did not create a debt; that the debt is not created until the water is furnished; and that as the General Assembly, in 1911, made an appropriation of $475,000 for the support and maintenance of Hospital No. 2 (Laws 1911, p. 41), the appropriation was made before the debt which he seeks to enforce was created, because the water for which he demands pay was not furnished until after the appropriation was made. And in support of his contention counsel cites: Water Co. v. Lamar, 140 Mo. 145; Saleno v. Neosho, 127 Mo. 627; Water Co. v. Lamar, 128 Mo. 188; and Water Co. v. Neosho, 136 Mo. 498. Each of those cases turned on the proper construction of Sec. 12 of Art. 10 of the Constitution. That section has to do only with the amount of indebtedness which a county, city, town, township, school district or other political corporation or subdivision of the State may incur, and has nothing to do with the power of the General Assembly to contract or authorize the contracting of any debt or liability on behalf of the State, which matter is governed by Sec. 44, Art. 4 of the Constitution. The contract at bar created not only a liability to take and pay for the water for ten years, but it also created a debt for the water main that was laid at a cost of $12,000. The contract provided that in consideration of the water company furnishing the labor and material necessary

to lay the main, excepting the excavating and refilling of the trenches, the hospital was to take its entire water supply for ten years thereafter at ten cents per thousand gallons. The moment the main was completed in 1906 (if not at the time the contract was made) a debt therefor was immediately created. It is conceded that no appropriation had been made to pay for the laying of the main. Therefore, the board had no power to make the contract for it. Constitution, Art. 10, Sec. 19. (2) The contract between the city and the water company created a legal duty on the part of the latter to furnish water to all of the inhabitants within the city limits as they then existed, or as they might thereafter be extended, at the rates fixed by the contract; and that so long as that contract was in force, the water company could not absolve itself from performing that duty to any person not then within the city limits by making a contract with such person to furnish him with water at a higher rate, which would be binding after the city limits were extended so as to include such person.

KENNISH, J.—This original proceeding in mandamus was brought by relator, the St. Joseph Water Company, a corporation owning and operating a waterworks system at the city of St. Joseph, this State, against the board of managers of State Hospital Number 2, located within the corporate limits of said city. Relator claims a balance due, for water supplied to said hospital, in the sum of $2186.33, which respondents refuse to pay, and the purpose of this suit is to coerce the payment of such claim by the writ of this court, commanding the respondents to comply with the statutory provisions in the allowance and payment of valid claims against institutions of that class.

Upon the filing of the petition an alternative writ was issued and in due time respondents made return thereto. Relator filed a general demurrer to the re-

turn, and the cause is thus at issue.

The facts are not in dispute, and so far as material in the view we take, they are as follows:

In the year 1900 relator was granted a franchise by the city of St. Joseph, authorizing it to construct and operate a waterworks system in said city for a term of twenty years. A contract, by ordinance duly enacted by the city and accepted by relator, was entered into, by the terms of which relator agreed to supply the city and the inhabitants thereof with water; at the rates therein prescribed, during the term of said franchise. The rate for water, used in such quantity as is admitted was used by the hospital, was six cents per 1000 gallons. Sections 3, 7 and 9 of said ordinance and contract are as follows:

"Sec. 3. Said water company shall extend its mains and pipe lines within the limits of said city along and over its streets, highways and public lands, as the city may from time to time by ordinance direct, and shall for each five hundred feet of said extension or fraction thereof erect and maintain a fire hydrant at such points as may be directed by ordinance or by the city engineer, and of the kind and character prescribed by ordinance; said city hereby agrees to and does rent from said company all hydrants so erected and maintained, and agrees to pay for each hydrant so erected and maintained the sum of forty dollars per annum; said water company shall erect and maintain intermediate hydrants when directed by the city, and shall be paid by the city the actual cost of such hydrants and the cost of setting the same, but shall be entitled to no compensation for the use thereof.

"Sec. 7. It shall be the duty of said water company during the term of this contract to supply good, clear, healthful and wholesome water for private consumption by the inhabitants of the city, and the rates to be charged private consumers of water during the

246 Mo.—6

continuance of this contract shall be those named in section 10 of Special Ordinance No. 2295, approved by the mayor of said city of St. Joseph on the 27th day of January, 1899, provided that it shall be the duty of said city from time to time to raise or lower such rates when the same shall be unreasonable.

"Sec. 9. Water shall be furnished to all private consumers at the same rates, and no partiality or inequality in rates shall be permitted."

In the year 1905, when the said State Hospital was situated a short distance outside the corporate limits of the city of St. Joseph, relator entered into a contract with the board of managers thereof, under which relator agreed to supply the hospital with water, for the ensuing term of ten years, and the board of managers agreed to pay therefor at the rate of ten cents per 1000 gallons. Water was furnished by relators under this contract, and was used and paid for by the hospital until the first day of July, 1910, being about one-half of the full term covered by the contract. After the date last mentioned, and until the filing of this suit, relator continued to furnish water to said hospital, but respondents have refused to pay therefor in excess of the rate of six cents per 1000 gallons, the rate as fixed in the contract between relator and the city.

In the year 1909 the corporate limits of the city of St. Joseph were extended so that the territory upon which said hospital was located was included in and became a part of said city.

Among other defenses to the issuance of the writ, respondents contend that by reason of the extension of the city limits the contract of 1905 between relator and the board of managers was abrogated and that the hospital was not bound to pay for water furnished more than the public rate of six cents per 1000 gallons. Respondents have paid relator for the water used at the public rate, but deny liability under the contract of

1905.   Relator contends that it is entitled to be paid at the rate of ten cents per 1000 gallons, in accordance with the contract of 1905, and the controversy is as to which of the two contracts shall control in determining the rights of the parties in the premises.   If, at the time of instituting this proceeding, the contract of 1905 was in force, then the balance claimed by relator was due and it is entitled to the relief prayed for.   On the other hand, if the extension of the city limits so as to include the hospital had the legal effect of limiting relator's charges to the rate provided by the ordinance, then the writ should be denied.

I.   The business of supplying the public with water, like that of supplying gas, electricity and other similar services, is a business impressed with a public use.   This proposition is so well recognized that it is needless to cite authorities in its support.   It is equally well-settled law that the fixing of rates for such a service is a governmental power.

In the absence of legislative action prescribing such rates, private parties may fix them by contract, and the rates so agreed upon will be upheld.   However, rates so fixed by private contract remain in force only so long as the legislative body having authority in the premises refrains from the exercise of its powers.   When public rates are established by law, rates fixed by private contract must yield.   The law upon this subject is stated in 3 Thompson on Corporations (2 Ed.), Sec. 2953, as follows:

"Until the Legislature or other body having the right to prescribe the rates to be charged by corporations, whose business is affected with a public interest, has exercised this power, the rates are the subject of contract between the corporation and its patrons.   And this is the case where the Constitution makes it the duty of the Legislature to prescribe reasonable maximum rates but the Legislature has failed

to do so. Since, however, the franchise is taken subject to regulation by the State in the exercise of its police power, the conclusion seems a sound one that the corporation cannot enter into a binding contract with a patron extending beyond the time when the Legislature or municipal council duly empowered thereto may fix the rates. It is plain that a public service corporation able to forestall legislative action by contract for a limited time could do so for so long a time as to render futile any legislative control.''

The city of St. Joseph, in the exercise of delegated legislative power, had prescribed by ordinance the rates to be charged by relator for water furnished to consumers under its franchise and contract with the city, and that ''water shall be furnished to all private consumers at the same rates, and no partiality or inequality in the rates shall be permitted.''

When the boundaries of a municipality are extended, all ordinances and contracts of a general character, in the absence of a special provision to the contrary, are simultaneously extended over and become operative in the added territory, and such territory becomes subject to the same burdens and entitled to the same privileges as that within the original limits. [St. Louis Gaslight Co. v. City of St. Louis, 46 Mo. 121; 28 Cyc. 217; 3 Dillon on Municipal Corporations (5 Ed.), Sec. 1325; Thornton on The Law Relating to Oil and· Gas (2 Ed.), Secs. 405 and 419; Des Moines v. Waterworks Co., 95 Iowa, 348; Mayor, etc., of City of Birmingham v. Birmingham Water Co., 42 So. (Ala.) 10; Indiana Ry. Co. v. Hoffman, 161 Ind. 593; People v. Detroit United Ry., 162 Mich. 460.]

In the St. Louis Gaslight case, supra, a case frequently cited in the textbooks and in the decisions of courts of other States, it appears that the gas company refused to comply with its contract with the city in territory annexed to the city after the contract was entered into. Discussing that question (p. 133), this court

said: "The additional orders for lamps were all to be within the city, and the city is a unit, though with changing boundaries. There might be a question as to the extension of the exclusive rights of the plaintiff, for grants of monopolies are to be strictly construed; but there is no doubt that a city ordinance or a city contract, designed for the city at large, operates throughout its boundaries whatever their change."

The foregoing authorities hold that when a general ordinance, fixing rates for a public service corporation, is in force in a city, such rates will apply to annexed territory, though a different rate, fixed by private contract, was in force in such territory before it was annexed. The case of Indiana Ry. Co. v. Hoffman, supra, declares the law in accordance with this rule, which is well stated in the second syllabus as follows:

"A street railroad company operating under an agreement with the city to issue transfer tickets free of charge to all passengers requesting the same who boarded its cars at any point upon its line within the limits of the city and whose destination might be any point upon any other line of the company within the city limits is bound to carry a passenger, tendering a transfer, to his destination on the company's line, though his destination was at a point in territory annexed to the city after the contract between the city and company was made, and on the company's interurban line on which it had a franchise entitling it to charge an additional fare outside the city as its limits were before the annexation of territory."

The principle upon which the cases hold that the legislative rate will supersede the rate previously fixed by private contract is that the parties enter into the contract in contemplation of the superior right of the government to establish such rates, and with knowledge that "private compacts cannot derogate from public right." [Thompson, supra, Sec. 2954.]

It follows that the contract of 1905 between relator and the board of managers was abrogated by the annexation to the city of the territory upon which the hospital was situated, and that the rate as fixed by the ordinance must determine the price to be paid for water thereafter used by the hospital, unless a different result must be arrived at by reason of relator's contention next to be considered.

II. It is contended by relator that, as the main through which the water was furnished to the hospital was not laid by direction of the city, with hydrants at intervals of 500 feet, for which the city was obligated to pay relator an annual rental, as provided by section 3 of the ordinance, therefore relator would not be governed by the ordinance rate for the water thus furnished.

Section 3 of the ordinance requires the laying of mains and the placing of hydrants by relator under the direction of the city. The requirement as to hydrants, for which a rental is to be paid to relator by the city, is doubtless for the protection of the public against fire, and when so directed to extend its mains then the question as to the hydrant requirement might properly be raised by relator. However, if relator should voluntarily lay a pipe or main without being directed so to do by ordinance, or use a main laid before the limits were extended, as under the facts of this case, it could not be successfully maintained that by so doing relator would be exempt from the ordinance rate for the reason that the hydrant requirement had not been complied with. Whether compulsory service within the city can be enforced against the public service corporation, by the consumer, regardless of the cost of installing mains, is a mooted question. [1 Wyman on Public Service Corporations, Sec. 278, et seq.] But if, with the consent of the consumer, it should see fit to render the service, then it must be done under the or-

dinance which requires that "water shall be furnished to all private consumers at the same rates."

III. Other defenses are made in respondents' return, namely: (1) That the contract of 1905 was invalid for want of capacity of the board of managers to make it, and (2) that relator had failed to furnish water to the hospital in accordance with the terms of the contract. As we decide the case in favor of respondents upon another ground, it is unnecessary to pass upon those defenses.

The alternative writ is quashed and the peremptory writ denied. *Valliant, C. J., Lamm* and *Brown, JJ.,* concur; *Woodson, J.,* concurs in a separate opinion; *Graves, J.,* dissents in an opinion in which *Ferriss, J.,* concurs.

## CONCURRING OPINION.

WOODSON, J.—This is an original proceeding instituted in this court, by the relator against the respondents, asking for a writ of mandamus, to compel them, as the board of managers of State Hospital Number 2, to order a requisition drawn upon the State Auditor, for the payment to said institution, out of the fund appropriated by the General Assembly, for the support and maintenance of said institution for the years 1911 and 1912, for the sum of $2186.33 alleged to be due the relator for water furnished to the institution from January 1, 1911, to February 1, 1912, under a certain contract to be presently stated; and to allow said account and to order a warrant drawn on the treasurer of said institution for said amount.

An alternative writ was issued as prayed, and in pursuance to its commands, the respondents in due time made return thereto. The facts stated in the return and admitted to be true, are as follows:

"On' November 1, 1905, the then board of managers of the hospital entered into a written contract with the water company by which it was agreed that, 'for and in consideration of the payments and covenants hereinafter agreed upon,' the water company agreed to lay and maintain from its main at Twenty-eighth and Brady streets to the hospital, a water main to connect with a six-inch main on the hospital grounds, the water company to furnish all the labor and materials, and the board of managers to do all necessary excavating and refilling of trenches; the main to be completed by May 1, 1906. There was already a six-inch main laid to supply the institution with water; and it was agreed that this main and the one contracted to be laid should be provided with water meters, and by-passes and gate valves, the by-pass valves to be closed and sealed and to be opened only 'in case of fire at the institution.'

"The water company further agreed to extend its mains for not more than 3000 feet in the asylum grounds and to erect thereon fire hydrants, not more than ten in number, as the necessities of the institution required. In consideration thereof it was further provided that the board of managers 'hereby agrees to take its entire water supply from the St. Joseph Water Company. . . . for said Hospital Number 2 for a period of ten years from December 31, 1905, said water to be supplied by meter measurements, and at the rate of ten cents per 1000 gallons ·. . . payments for all water used to be made monthly.' And, lastly, it was stipulated that the water company should 'not be held responsible for any loss or damage occasioned or caused by fire, water, failure to supply water or pressure, or any other cause whatever.'

"Neither at the time said contract was entered into nor at any time prior or subsequent thereto did the General Assembly make any appropriation for the payment of the water to be furnished and used, or for the payment of the improvement provided for in the

contract. Prior to the date on which this contract was made the water company had accepted a franchise from the city of St. Joseph, by the terms of which the water company, among other things, agreed to furnish a water supply for the city and the inhabitants thereof during a period of twenty years from December 10, 1899, the water to 'be furnished to all private consumers at the same rates,' the rate for all those consuming 1,000,000 gallons or more per month being six cents per 1000 gallons. It is admitted that the hospital has always consumed in excess of 1,000,000 gallons per month. The contract with the city contained this provision:

" 'Section 3. Said water company shall extend its mains and pipe lines within the limits of said city along and over its streets, highways and public lands, as the city may from time to time by ordinance direct, and shall for each 500 feet of said extension or fraction thereof erect and maintain a fire hydrant at such points as may be directed by ordinance, or by the city engineer, and of the kind and character prescribed by ordinance; said city hereby agrees to and does rent from said company all hydrants so erected and maintained, and agrees to pay for each hydrant so erected and maintained the sum of forty dollars per annum. . . .'

"At the time the contract was made with the city the hospital was about one mile east of the city limits; but in July, 1910, they were extended, and thereafter the asylum grounds were wholly within the city limits.

"The water main laid pursuant to the contract between the water company and the board of managers cost $12,000, and was laid partly on public and partly on private grounds. The water is supplied to the institution through this main and the six-inch main laid prior to the time the contract in question was executed, this main being in a public street. It has fire hydrants

State ex rel. v. Geiger.

attached, and furnishes connections for other private consumers.

"The hospital buildings are four stories high, and it is admitted that relator did not at any time furnish the hospital with all the water necessary for the use and support of the institution, in this, that it failed to furnish water sufficient to flush the numerous toilets on the top floors of the buildings necessarily used by the employees and inmates; and failed to furnish water in sufficient volume to afford any protection against fire, the water furnished not being sufficient 'to be thrown through the ordinary fire hose and nozzle above the first floor of said buildings.'

"Because of that fact, and because they claimed that the former board of managers had no power to make the contract, and that the water company was compelled to furnish it with water after the city limits were extended, at the same rate at which it was obligated to furnish water to other inhabitants of the city, to-wit, six cents per 1000 gallons, the present board of managers after July, 1910, 'refused to recognize said contract, or to receive the water used by said institution, pursuant to the terms thereof, or to pay the price mentioned therein, but at all times claimed to receive the water used by said institution from the relator, pursuant to the rights and obligations created by said franchise,' and paid to relator six cents per 1000 gallons for all water consumed, as provided by the terms of the franchise; which sum, however, the relator 're-ceived for credit only and declined to receive the same in full payment.' It is admitted that if the relator is entitled to collect ten cents per 1000 gallons the sum claimed in the petition is the correct amount for the water used during the entire time stated in the writ."

(Note—Counsel for respondents state that, "The return does not state that the hospital was located about one mile east of the city before its limits were extended, nor that the main first laid was in a public

street and had attached to it fire hydrants and furnished connections for other private consumers; but, at relator's request, we assume the first statement to be true. The second statement was admitted by relator's counsel to be true on oral argument."

I.   Many questions, such as the sources of the revenues provided for the support and maintenance of this class of institutions, the means by which they are collected, preserved and disbursed, have been quite elaborately stated and discussed by counsel for the relator, but in our opinion, they are immaterial to any real controversy presented by this record, and for that reason they will be put aside without further comment.

We start out in this case, as in all others, with the presumption that a contract, fair upon its face, is valid and binding upon the parties thereto until the party assailing its validity charges and proves its invalidity.

The subject-matter of this contract, namely, the supply of water, involved in this case, is clearly embraced within the purview and authority of the board of managers of this institution, as expressed in the laws of the State governing such institutions.

The principal question presented for determination, is not that the board of managers are without authority to make a legal and binding contract with the relator, to furnish water for this institution and its officers and inmates, but the contention is, that the particular contract mentioned in this case is null and void for the reason claimed, that certain provisions thereof violate certain provisions of the Constitution, to be presently noted.

Counsel for respondents first assail the validity of said contract in the following language:

"The contract was made November 1, 1905, and provided that in consideration of the water company furnishing the labor and material necessary to lay the

water main (which amounted to $12,000) the hospital should take its entire supply of water from the company for a period of ten years thereafter at ten cents per thousand gallons. The main was completed May 1, 1906. Neither at nor before the time the contract was entered into, or the main laid, was there any appropriation made by the General Assembly to pay for the water to be used, or for the main to be laid under the contract. The board of managers, therefore, had no power to contract any such debt or liability as was created by this contract."

They cite in support thereof Secs. 43 and 44, Art. 4, and Sec. 19, Art. 10 of the Constitution of 1875.

In so far as it is material to this case, said section 43 reads as follows:

"All revenue collected and moneys received by the State from any source whatsoever shall go into the Treasury, and the General Assembly shall have no power to divert the same, or to permit money to be drawn from the Treasury, except in pursuance of regular appropriations made by law. All appropriations of money by the successive General Assemblies shall be made in the following order: . . .

"Sixth, For the support of the eleemosynary institutions of the State."

Said section 44, so far as applicable, reads: "The General Assembly shall have no power to contract or to authorize the contracting of any debt or liability on behalf of the State, or to issue bonds or other evidences of indebtedness thereof, except in the following cases." It is conceded that none of the exceptions provided for in this section have any application to the facts of this case.

And said section 19 reads: "No moneys shall ever be paid out of the Treasury of this State, or any of the funds under its management, except in pursuance of an appropriation by law; nor unless such payment

be made, or a warrant shall have issued therefor, within two years after the passage of such appropriation act; and every such law, making a new appropriation, or continuing or reviving an appropriation, shall distinctly specify the sum appropriated, and the object to which it is to be applied; and it shall not be sufficient to refer to any other law to fix such sum or object. A regular statement and account of the receipts and expenditures of all public money shall be published from time to time.''

The position of counsel for respondents is, that the contract made and entered into, on November 1, 1905, by and between the hospital and the water company, whereby the latter agreed to construct the water main, mentioned therein, at a cost of $12,000, and to supply the former with all the water it should use for a period of ten years, from the date of its completion, which was May 1, 1906, for a consideration that the former should pay to the latter ten cents a thousand gallons for each and every thousand gallons used by it each and every month during said ten years, was absolutely null and void, for the reason that the General Assembly had not on either of the dates stated, made an appropriation for either of the purposes mentioned, as required by said constitutional provisions.

Counsel for the relator concedes, as contended by counsel for respondents, that the board of managers had no authority under the Constitution to create any debt before the money necessary to pay it had been appropriated by the Legislature; but he seeks to escape the contention of respondents, by insisting that the mere making of the contract mentioned did not create a debt, for the reason stated by him in the language of this court, in the case of Water & Light Co. v. City of Lamar, 140 Mo. 145, l. c. 156, where it is said the contract is analogous to contracts for the public supply of water by municipalities in which it is held ''that no indebtedness of the city (within the meaning of sec-

tion 12 of the tenth article of the Constitution) accrues under the contract until the supply of water has been furnished, as agreed, year by year. Hence we hold that the sum total of the payments that may possibly become due (if the contract be performed by the contractor during its entire term) is not to be taken as the amount of the indebtedness incurred by the making of the contract at the outset. We are aware that there is conflict of judicial and other opinion on this point (43 Cent. L. Jour. 381). But the matter was plainly and clearly presented to the court in Banc, and was positively decided as above indicated, in the Neosho case. That ruling was followed in the former judgment in the Lamar case (128 Mo. 188) and more recently in the second appeal in the Neosho case (136 Mo. 498). We are content to abide by those decisions without reopening the merits of the discussion which they should be taken as closing.''

He also cites Saleno v. City of Neosho, 127 Mo. 627, and Trask v. Livingston County, 210 Mo. 582.

The case last cited reiterates the approval of this court of the language of Judge Dillon in his excellent work on Municipal Corporations, expressed in this language:

'' 'Under the constitutional provisions in Iowa, Illinois, Indiana and Pennsylvania, referred to, it is held that a corporation may make a contract (at least for necessaries) covering a series of years, upon which an obligation to pay may arise from year to year as the thing contracted for is furnished, and in such case, the whole amount which may ultimately become due does not constitute a debt within the constitutional prohibition. But in order to ascertain whether the corporation by such contract is transgressing the limit, regard is had only to the amount which may fall due within a certain year or other period; and if the revenues for that year or other period are sufficient, over and above the payment of other expenses, to pay

such amount, there is no debt incurred within the constitutional prohibition.' [Dillon on Mun. Corp. (4 Ed.), Sec. 136a.]''

Continuing, the opinion says: '''The term ''indebtedness'' is a wide one, and must be construed in every case in accord with its context. It has been very recently considered, in its application to the subject in hand, by the court in Banc, and the conclusion was announced that such an obligation to pay an agreed sum, year by year, for the furnishing of certain necessary supplies during a term of twenty years, was not an *immediate* indebtedness *for the entire amount* that might ultimately become due by installments during that term.' ''

But in passing, in order to show the deep desire of the people of the State to observe and live up to those constitutional prohibitions against the State or any of its political subdivisions going in debt, except as therein provided, the Legislature duly enacted Sec. 1378, R. S. 1909, which under severe pains and penalties, stated therein, also prohibits the board of managers, and all other officers and agents of such institutions, from contracting any debt in the name of any such institution for the payment of which there had not previously been made an adequate appropriation.

Under this view of the law, counsel for relator, notwithstanding the stringency of its provisions, further insists that since the contract in question expressly stipulates that the hospital agreed to take its entire water supply from the water company for a period of ten years from December 31, 1905, said water to be supplied by meter measurements, at the rate of ten cents per thousand gallons, to be paid for monthly, clearly comes within the rulings of this court as announced in the cases previously cited. In other words, that no debt was incurred on behalf of the hospital, when the contract in controversy was entered

into, nor until the water was furnished by the relator and actually received and used by the former, which under the terms of the contract, was to be paid for monthly, and consequently the indebtedness was incurred monthly, and not from year to year, nor for a period of ten years.

That being true, as contended, it is further insisted that, as the General Assembly by an Act approved March 24, 1911 (Laws 1911, p. 41, Sec. 16), appropriated for the support and maintenance of said institution for the years 1911 and 1912, the sum of $475,000 (the appropriation having been made prior to the time when said monthly debts were incurred as previously stated) which included those claims for water furnished, together with all other obligations which were necessarily contracted during those years for the support and maintenance thereof, said water debts were not incurred, within the meaning of said constitutional and statutory inhibitions, prior to the time the appropriations were made to meet their payment.

In answer to that contention, counsel for respondents insist that said contention of relator is unsound and that the authorities cited have no application to the facts of this case, for the reason stated, that they "involved the validity of a contract made by a city of the fourth class for a supply of water for a term of years." Each case turned on the proper construction of Sec. 12, Art. 10 of the Constitution. "That section has to do only with the amount of indebtedness which a county, city, town, township, school district or other political corporation or subdivision of the State may incur, and has nothing to do with the power of the General Assembly to contract debts or authorize the contracting of any debt or liability on behalf of the State, which matter is governed by Sec. 44, Art. 4 of the Constitution."

The various contentions and concessions made by counsel for the respective parties, as previously stated, bring us to the consideration of the first legal proposition presented by this record, for determination, namely: Are the eleemosynary and other charitable institutions of the State political subdivisions thereof within the meaning of Sec. 12, Art. 10 of the Constitution, or are they simply a part of, or the arm or hand of the State, by which it disperses charity to her poor and unfortunate citizens?

If these worthy institutions are political subdivisions of the State within the meaning of said section 12 of article 10, then clearly the query propounded must be answered in favor of the relator. If, however, upon the other hand, they are not such, but are the arm of the State by which she cares for her unfortunate dependents, then section 44 of article 4 applies, and in that event, the question must be decided in favor of the respondents.

Counsel for respondents cite no authority for their contention that these eleemosynary institutions of the State are not political subdivisions of the State, within the meaning of Sec. 12, Art. 10 of the Constitution, but content themselves by presenting an ingenuous argument showing that the cases relied upon by counsel for relator have no application to the facts of this case.

The language of said constitutional provision is: "No county, city, town, township, school district or other political corporation or subdivision of the State shall be allowed to become indebted," etc.

Clearly these eleemosynary institutions are not and do not constitute the State itself, and I am unable to discern anything in the language of the constitutional provision just quoted which indicates a design in the minds of the framers of the Constitution to differentiate them from the general classification of

the institutions mentioned in said section 12. It seems to me that they, in a limited sense at least, possess and perform the same political or governmental powers that are possessed and exercised by counties, cities, towns, townships, school districts and all other political corporations of the State.

While it is true that some of the institutions named possess and exercise private or individual powers, which are separate and independent of all political authority, nevertheless, they are, and are so declared to be, and are designated in said section 12 of the Constitution as, political corporations or subdivisions of the State; and when we view and consider those institutions in their public or political aspect, I am unable to distinguish any difference in the source of and the character of the powers possessed and exercised by them, and the authority possessed and exercised by these eleemosynary institutions. The difference does not consist in character, nor the source from which their respective powers are derived. Both are derived from the sovereign State, and both are public in character, organically the same, but differ in functions only; and especially is this true as to the public school districts of the State, and as to these eleemosynary institutions.

The powers of each are purely public, neither possessing any private or individual rights, such as are enjoyed by cities, towns, etc. Both may sue and be sued in their public capacity, but neither is liable individually for any wrong committed by its officers or agents, nor on contracts, except those made in pursuance to the laws of the State regarding matters within the purview of their public purpose.

Moreover, it is perfectly clear from the language used, that said Sec. 44 of Art. 4 only applies to debts and liabilities, of the State in its sovereign capacity, and it has no reference whatever to the public corporations or other public subdivisions of the State.

That being unquestionably true, and if it be equally true, as contended for by counsel for respondents, that said eleemosynary institutions are not embraced within the provisions of said Sec. 12 of Art. 10 of the Constitution, then there was no law of the State which then or now prohibits the board of managers of such institutions to incur any debt whatever for the supplying of them with water, either with or without a vote of the people of the State, except as stated in said Sec. 1378, R. S. 1909, for the simple reason stated, that, if section 44 applies to the State's indebtedness only and section 12 does not embrace these institutions, then there is no law, constitutional or statutory except as stated, to be found in the books which has any reference to them, and that statute was enacted in 1909. [Laws 1909, p. 572.]

If the contention of counsel for respondents in this particular is correct, then the boards of managers and other properly constituted authorities of all such institutions, were, until the enactment of said section 1378, in the year 1909, absolutely untrammeled and unrestrained in their authority to contract debts on behalf of those institutions, and consequently the board of managers in this case had, on November 1, 1905, full power and authority to make and enter into the contract of that date with the water company to furnish water to this institution.

That contention proves too much, and if sound, the peremptory writ of mandamus should be issued, if not denied for some other reason.

That contention of counsel, in our opinion, is not only a strained and unwarranted construction of Sec. 44, Art. 4 and Sec. 12, Art. 10 of the Constitution, but it is clearly unsound, when read in the light of the character, nature and necessities of all of the public corporations of the State, and especially the public policy of the State in regard to itself going into debt, or any subdivision thereof.

It is just as necessary for these great eleemosynary institutions of the State to have a good and adequate water supply, as it is for the cities, towns and villages, mentioned in said section 12 of article 10 to have it. Many of the former have a larger number of unfortunate inmates than some of the latter have inhabitants, and the necessities of the unfortunate are always greater than are those of their more fortunate brothers.

If, under the condition of things, as they existed as shown by this record, the officers of this institution had no authority to make a contract for a water supply similar to the one in question, then it would have been almost a physical impossibility for them to have procured water for that great institution, notwithstanding the burning necessities therefor, for the reason it could not have constructed and operated a water plant of its own, and it is not reasonable to suppose that the relator would have constructed the new main for that purpose in the absence of some definite understanding as to what compensation it was to receive in return therefor.

We are, therefore, of the opinion, that the eleemosynary institutions of the State are public corporations and are embraced within the provisions of Sec. 12, Art. 10 of the Constitution, and that the contract made and entered into, by and between the water company and the board of managers of Hospital Number 2 was valid when made, and that the debts incurred thereunder were from month to month, for the water furnished and used from month to month, and not from year to year, nor for a period of ten years, as contended for by counsel for respondents; and since the appropriation approved March 24, 1911, for the support and maintenance of this institution for the years 1911 and 1912, was sufficient for all purposes, and made prior to the time the debts were incurred,

they are valid, or rather were not prohibited by said section 12 of the Constitution.

II. The validity of the contract and the indebtedness incurred thereunder, mentioned in this proceeding are also challenged by counsel for respondents for the reason stated, that in consideration of the agreement that the water company should furnish the labor and materials necessary to lay the water main, which was to cost about $12,000, the hospital was to take its entire supply of water from the company for a period of ten years, and in consideration thereof, the ten cents mentioned was to pay for not only the water used, but was also to include and pay for the cost of the labor and materials used in constructing the water main, through which said water was to be furnished. In other words the hospital, when it entered into the contract mentioned to pay for the water used, also agreed to pay the $12,000 which was the cost of the construction of said water main; that this part of the contract created an indebtedness on the part of the hospital, at the time the contract was made and entered into, namely, November 1, 1905, and that the agreement was to pay it in equal monthly installments during the period of ten years, for which it was to take and use the water, which it is claimed, is clearly in violation of the Constitution, for the reason that there is no pretense that the appropriation of March 24, 1911, for the support and maintenance of the institution for the years of 1911 and 1912, was made for the payment of the cost of constructing said water main.

If the contract in question means what counsel thus insist that it does, then there would be much force in that insistence, but in our opinion the contract is not susceptible of any such construction. Neither the language of the contract nor the intention of the parties thereto, as gleaned from the four corners thereof, indicates that the hospital was to pay the cost of the

construction of the water main, in monthly install-
ments or in any other mode or manner.

We, therefore, rule this insistence against the re-
spondents.

III.   Prior to the date of the contract involved in
this controversy, the city of St. Joseph granted to the
water company a franchise to furnish water to it and
to the inhabitants thereof, for a period of twenty
years, from and after December 10, 1899, and author-
ized it to charge for the water furnished them, cer-
tain rates stated therein.   In consideration of said
grant the water company agreed with the city, and on
behalf of the inhabitants thereof, that it would fur-
nish water at those rates, and that all private consum-
ers were to have the same rates and that no inequality
or partiality in rates should be permitted.

The rate so agreed upon to persons who used the
water in excess of one million gallons per month was
six cents per thousand gallons; and it was admitted
that the hospital has at all times consumed more than
that quantity.

Under the obligations imposed upon the water
company by said contract, counsel for respondents
insist that it became the legal duty of the company to
furnish water to all of the inhabitants within the limits
of the city, as they then existed, or as they might there-
after be extended, at the rates fixed by said contract
and that so long as said contract remained in force it
could not absolve itself from performing that duty
to any person notwithstanding the fact that such per-
son did not reside in the city at the time it was made
and entered into, and notwithstanding the further
fact that the company made another contract subse-
quent to the one made with the city, by which it agreed
to furnish him water at a higher rate than specified,
provided the limits of the city were subsequently ex-

tended so as to include him therein. In other words, it is insisted that under the law, the extension of the city limits so as to include the hospital, relieved it of the contract obligation to pay ten cents per thousand gallons, and imposed upon the relator the corresponding duty to furnish water to it at the same rates it agreed with the city to furnish water to all other consumers, who consumed equal quantities, namely, six cents per thousand gallons to all who used one million gallons or more each and every month.

Counsel for the relator concedes that ordinarily this insistence of respondents is well grounded, but he endeavors to escape the effects thereof by contending that section 3 of the contract between the city and the water company removes this case from the rule of law just stated. Said section reads as follows:

"Sec. 3. Said water company shall extend its mains and pipe lines within the limits of said city along and over its streets, highways, and public domains, as the city may from time to time by ordinance direct, and shall for each five hundred feet of said extension or fraction thereof, erect and maintain a fire hydrant at such points as may be directed by ordinance or by the city engineer, and of the kind and character prescribed by ordinance; said city hereby agrees to and does rent from said company, all hydrants so erected and maintained for the sum of forty dollars per annum."

The relator's position in regard to this section of the contract is best stated in the following language of counsel, viz.:

"The rule of law is undoubtedly correct that in accepting a franchise, a water company acts not as a private but as a quasi-public corporation. It enjoys and must exercise its opportunities for gain subject to its obligation to the public in the absence of a contract fixing the rates that it will supply water without unjust discrimination and at uniform rates to all those

along the lines of its mains who apply and tender a reasonable compensation.

"30 Am. & Eng. Ency. Law, 426, and cases cited.

"The mains above referred to are public, not private.

"These rates, however, are under the public contract with the city based upon an additional compensation of a hydrant rental for each five hundred feet of mains laid pursuant to the order of the city and other conditions. ·

"The pipe line in question was not laid pursuant to the city contract and could not be for the reason that at that time the State Hospital was at least a mile beyond the city limits and it is only by reason of the fact that since the limits of the city have been extended so as to take in the hospital that the defendants claim the benefit of the public rate granted to those inhabitants who are located on one of the public lines described and provided for in the contract with the city. Under Sec. 3 of the contract with the city, the city has the right to order a public line extended to the hospital under the terms and conditions therein expressed. When that is done the hospital will be entitled to the six-cent rate, and until that is done there is no such privity of contract between the water company and the defendants under the city contract, that would give the defendants any right to enforce the rates therein provided for. The city could not under its contract with the relator require the water company to furnish water to the defendants until it had ordered an extension of a public line to their institution and provided for the rental of the requisite number of hydrants as the contract provides—and if the city cannot do so neither can the defendants—to hold otherwise would be to permit the city through the defendants to violate the obligation of its contract with the water company and force it to maintain a private line over private property for public use, at public

rates, without paying the hydrant rental provided for in its contract. This is only one of many conditions contained in the contract between the city of St. Joseph and the water company and the rates prescribed by this contract can only be taken advantage of by those inhabitants of the city who are located upon a public main laid and provided for under the terms and conditions of that contract.''

In our opinion that position is untenable for the reason that it is admitted that there are two water mains which supply water to the hospital. The first was constructed by the company, at the cost of the hospital, in the year 1885, and was laid partially in what was then a public street of the city, and partially in what was a public highway of Buchanan county, but since the extension of the city limits it is now wholly within the public streets of the city of St. Joseph, and there are attached to it five fire hydrants, and it furnishes water for other private consumers. The other main is the one constructed by the company in pursuance to the contract here involved, and is laid partially on public property and partially on private. Neither of these mains was ordered to be constructed by an ordinance of the city of St. Joseph.

Upon that state of facts, counsel for relator, as previously stated, contends that because the city did not, by ordinance, direct the construction of either of those mains the company is under no legal obligation to furnish water through either of them to *any private consumer,* the hospital included, at the rates specified in the contract between the city and the water company.

If the conclusion thus drawn from those facts by counsel is sound, then in all cases where the company has *voluntarily* laid its mains in the public streets of the city, or across private property (which in all probability exceed in length those mains directed to be laid by ordinance), it could lawfully refuse to supply the

inhabitants of the city with water through them at the rates stipulated for in the contract between the city and company, then the latter could to that extent evade the schedule of prices so agreed to, and compel all such inhabitants individually to pay such prices for the water furnished through those mains, as they and the company might from time to time agree upon, and thereby practically nullify the contract between it and the city, as to the prices to be paid by them for the water used.

And as suggested by counsel for respondents, "the obligation of the water company under the contract to furnish all the inhabitants within the city limits with water at the rate specified in its franchise is absolute. It is not made contingent upon whether the water main is laid voluntarily or pursuant to an ordinance directing it to be laid. It may be that if the water company voluntarily lays mains, the city would be under no obligation to rent the hydrants erected by the company upon such mains, but further than that, the provision (said section 3) quoted from the contract between the city and the water company has no application to this case."

We, therefore, rule this question against relator.

IV.    There are two or three other minor questions presented and discussed by counsel in their briefs; since, however, they can in no manner change the conclusions before reached, we deem it unnecessary to pass upon them.

I am, therefore, of the opinion that the peremptory writ of mandamus should be denied, and that the alternative writ heretofore issued should be quashed and for naught held.

### DISSENTING OPINION.

GRAVES, J.—I do not concur in the views expressed by our brother KENNISH in this cause. I agree

that as a general rule ordinance rates for water and light supplies should be and by force of the law are extended to the territory annexed to the city subsequently. This is the rule in ordinary cases, but the case in hand is not one of the ordinary kind. The facts are not fully developed by the opinion. In this case the city rate was fixed by the ordinance. The asylum was a great distance from the city limits and had no water supply. In this situation it was agreed that if the water company would at its own expense run a water main to the asylum for the purpose of supplying water to the asylum, the asylum would take water for a fixed period of ten years and at the fixed rate of ten cents instead of six cents. The fixed term of ten years and the additional price to be paid was the consideration moving to the water company for the great outlay it would be at in constructing the water main, which, as a matter of fact, was constructed without reference to streets in the territory subsequently added to the city. That this contract was a valid one when made I have no doubt, and the principal opinion does not say otherwise. If it was valid then, in my judgment it is valid now. I do not believe that any person or corporation can say to another person or corporation, you expend ten or twelve thousand dollars to get pipes to my place, as was done in this case, and I will take water from you for a given term and at a rate in excess of the ordinance rate, and then afterward for any reason evade the conditions of the contract. The parties knew that the rate was in excess of the ordinance rates and they further knew that an expenditure of so much money would be required to carry out the contract by the water company. Let us test the law by an extreme case. Suppose the water company had been compelled in order to get to the asylum to run its mains in a way that they would be wholly useless as general water mains in the new addition to the city. Suppose further that they would not do this, except for

a given consideration, and the asylum agreed to the consideration. Now in this supposed case would it appear right to say that simply because the general territory was taken into the city limits, the whole or greater part of the consideration moving from the asylum to the water company for its great outlay in expenses would be wiped out merely by taking into the city the whole territory involved? We think not. In the supposed case the outlay of ten or twelve thousand dollars might be made today, and tomorrow the city by expansion would wipe out the whole consideration, and leave the water company with a mile or more of piping good only for the one purpose, i. e., the contract purpose.

So I say the contract was valid when made; that it, in one respect, has been fully performed by the expenditure of ten or twelve thousand dollars, and that this case does not fall within the general doctrine relied upon by my brother. Had the contract for rates with the asylum made no call for the expenditure mentioned, the case might be more easily reconciled with general pronouncements.

We do not deny that public service corporations can be made to furnish water and light to newly added territory at the ordinance rate, but that general pronouncement of the law does not make another valid contract bad, when it was good when made. I therefore most respectfully dissent. *Ferriss, J.,* concurs in these views.